**ORAL ARGUMENT NOT YET SCHEDULED**
No. 22-1210 and consolidated cases

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

SINCLAIR WYOMING REFINING COMPANY LLC, ET AL.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondent*.

---

ON PETITIONS FOR REVIEW OF FINAL AGENCY ACTION
OF THE ENVIRONMENTAL PROTECTION AGENCY

---

**Initial Brief of Intervenors for Respondent
Responding to Biofuels Petitioners**

---

Robert J. Meyers
Elizabeth B. Dawson
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
(202) 624-2789

Richard S. Moskowitz
Tyler Kubik
American Fuel & Petrochemical
Manufacturers
1800 M Street, NW, Suite 900N
Washington, DC 20036

*Counsel for American Fuel &
Petrochemical Manufacturers*

Robert A. Long, Jr.
Kevin F. King
Thomas R. Brugato
Daniel G. Randolph
MaKade C. Claypool
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-5488

Ryan Meyers
John Wagner
Michele Schoeppe
American Petroleum Institute
200 Massachusetts Ave. NW
Suite 1100
Washington, DC 20001

*Counsel for American Petroleum
Institute*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Intervenors hereby certify as follows:

### A.  Parties, Intervenors, and *Amici Curiae*:

All parties, intervenors, and *amici curiae* appearing in this case are listed in the Brief for Biofuels Petitioners (Doc. 1992555) at i-ii.

### B. Rulings Under Review:

The action under review is EPA's final rule entitled "Renewable Fuel Standard (RFS) Program: RFS Annual Rules," 87 Fed. Reg. 39,600 (July 1, 2022) (the "2020-2022 Rule").

### C. Related Cases:

The 2020-2022 Rule was also challenged by the Center for Biological Diversity in a case that was previously consolidated with these actions but later severed.  *See Center for Biological Diversity v. EPA*, No. 22-1164 (D.C. Cir. filed July 20, 2022).  On August 9, 2023, the parties jointly stipulated to voluntarily dismiss the case (Doc. 2011625).

The 2020-2022 Rule has not been challenged in any proceedings other than these consolidated cases.  However, the issues in these cases overlap with other cases involving EPA's Renewable Fuel Standard Program, as described in the Brief of Respondent EPA (Doc. 2009125) at ii-iii.

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Intervenors submit the following statements:

**American Petroleum Institute** ("API") is a nationwide, not-for-profit association representing approximately 600 member companies engaged in all aspects of the oil and gas industry, including science and research, exploration and production of oil and natural gas, transportation, refining of crude oil, and marketing of oil and gas products.  API has no parent companies, and no publicly held company has a 10 percent or greater ownership interest in API. API is a "trade association" within the meaning of Circuit Rule 26.1.  API is a continuing association operating for the purpose of promoting the general commercial, professional, legislative, or other interests of its members.

**American Fuel & Petrochemical Manufacturers** ("AFPM") is a national trade association whose members comprise most U.S. refining and petrochemical manufacturing capacity.  AFPM has no parent companies, and no publicly held company has a 10 percent or greater ownership interest in AFPM.  AFPM is a "trade association" within the meaning of Circuit Rule 26.1.  AFPM is a continuing association operating for the purpose of promoting the general commercial, professional, legislative, or other interests of its members.

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

RULE 26.1 DISCLOSURE STATEMENT.............................................. ii

TABLE OF CONTENTS.......................................................... iii

TABLE OF AUTHORITIES .................................................... iv

GLOSSARY.................................................................. vii

STATUTES AND REGULATIONS.................................................. vii

SUMMARY OF ARGUMENT .................................................... 1

ARGUMENT .................................................................. 4

I.     The Biofuels Petitioners' Challenge to EPA's Application of the
       Cellulosic Waiver Authority Fails................................... 4

       A.     The Statute's Text and Structure Make Clear that the "Projected
              Volume Available" Does Not Include Carryover Cellulosic
              RINs........................................................ 5

       B.     The Biofuels Petitioners' Approach Would Undermine the
              Liquidity of the RIN Bank and the Stability of the RFS Program..... 10

       C.     The RFS Program Includes Multiple Safety Valves for
              Cellulosic Biofuel Because Congress Was Particularly
              Concerned About Production Shortfalls for that Fuel Category........ 15

II.    For the Same Reasons, the Biofuels Petitioners' Challenge to the
       EPA's Reset Authority Also Fails................................... 18

CONCLUSION .............................................................. 19

CERTIFICATE OF COMPLIANCE................................................ 20

CERTIFICATE OF SERVICE .................................................. 21

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases***

*AFPM v. EPA*,
   937 F.3d 559 (D.C. Cir. 2019).................................................................... 6, 13

*Alon Refin. Krotz Springs, Inc. v. EPA*,
   936 F.3d 628 (D.C. Cir. 2019)................................................................. 11, 13

*Ams. for Clean Energy v. EPA*,
   864 F.3d 691 (D.C. Cir. 2017)......................................................... 2, 6, 10, 12

*API v. EPA*,
   706 F.3d 474 (D.C. Cir. 2013)............................................................. 3, 4, 8, 15

*Barnhart v. Thomas*,
   540 U.S. 20 (2003) .............................................................................................6

*Garvey v. Admin. Rev. Bd.*,
   56 F.4th 110 (D.C. Cir. 2022) ...........................................................................4

*Monroe Energy, LLC v. EPA*,
   750 F.3d 909 (D.C. Cir. 2014)........................................................................13

*Motor Vehicle Mfrs. Ass'n of U.S. v. Ruckelshaus*,
   719 F.2d 1159 (D.C. Cir. 1983).......................................................................11

*PDK Lab'ys Inc. v. DEA*,
   362 F.3d 786 (D.C. Cir. 2004)...........................................................................5

*Rotkiske v. Klemm*,
   140 S. Ct. 355 (2019) .....................................................................................4, 5

*Russello v. United States*,
   464 U.S. 16 (1983) ..........................................................................................10

---

* Authorities upon which we chiefly rely are marked with asterisks.

*United States v. Novo A/S*,
  5 F.4th 47 (D.C. Cir. 2021) ....................................................................10

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) .............................................................................5

**Statutes**

42 U.S.C. §
      7545(*o*)(2)(A)(i) .................................................................9
      7545(*o*)(2)(A)(iv) ..............................................................9
      7545(*o*)(2)(B) ...................................................................16
      7545(*o*)(2)(B)(i) ................................................................9
      7545(*o*)(2)(B)(i)(III) .......................................................16
      7545(*o*)(2)(B)(ii) ...................................................... 9, 18
      7545(*o*)(3)(A) ................................................................8, 9
      7545(*o*)(5)(A) .................................................................11
      7545(*o*)(5)(A)(i) ..............................................................9
      7545(*o*)(5)(A)(ii) .............................................................9
      7545(*o*)(5)(B). ...............................................................11
      7545(*o*)(5)(C) ................................................................11
      7545(*o*)(5)(E) ...................................................................9
      7545(*o*)(7)(D)(i)..................................... 1, 4, 5, 6, 7, 8, 9, 16
      7545(*o*)(7)(D)(ii) ...................................... 9, 10, 15, 17
      7545(*o*)(7)(D)(iii) ............................................................9
      7545(*o*)(7)(F) .................................................................18

42 U.S.C. § 7545(*o*)(2)(B)(iii) (2006) ................................ 3, 15

42 U.S.C. § 7545(*o*)(4) (2006) .............................................16

Energy Independence and Security Act of 2007,
  Pub. L. 110-140, 121 Stat. 1492 .......................................16

**Regulatory Materials**

2020-2022 RFS Response to Comments (2022) .........................................14

40 C.F.R. § 80.1428(c)............................................................ 11, 13

40 C.F.R. § 80.1456(b) ...............................................................15

72 Fed. Reg. 23,900 (May 1, 2007) ................................................................. 13, 16

75 Fed. Reg. 14,670 (Mar. 28, 2010) ......................................................................17

80 Fed. Reg. 77,420 (Dec. 14, 2015) ......................................................................7

*87 Fed. Reg. 39,600 (July 1, 2022) ....................................... 1, 3, 13, 14, 16, 18, 19

## GLOSSARY

| | |
|---|---|
| AFPM | American Fuel & Petrochemical Manufacturers |
| API | American Petroleum Institute |
| Biofuels Br. | Initial Brief for the Biofuels Petitioners (Mar. 30, 2023), Doc. No. 1992555 |
| Biofuels Petitioners | Iogen Corp.; Iogen D3 Biofuels Partners II LLC; Waste Management, Inc.; and WM RenewableEnergy, LLC |
| EPA | Environmental Protection Agency |
| RFS | Renewable Fuel Standard |
| RIN | Renewable Identification Number |
| 2020-2022 Rule | "Renewable Fuel Standard (RFS) Program: RFS Annual Rules," 87 Fed. Reg. 39600 (July 1, 2022) |

## STATUTES AND REGULATIONS

Except for the additional material in the attached addendum, all applicable statutes and regulations are contained in the addenda attached to the EPA's and Petitioners' briefs.

Intervenors API and AFPM submit this brief in response to the challenges raised by the Biofuels Petitioners to EPA's regulation setting the Renewable Fuel Standards for the years 2020-2022. *See* 2020-2022 Rule. For the reasons that follow, the Court should deny those petitions for review.

## SUMMARY OF ARGUMENT

The Biofuels Petitioners raise two challenges that depend on a single, overarching contention: EPA must account for carryover cellulosic RINs when it calculates the "projected volume available" under 42 U.S.C. § 7545(*o*)(7)(D)(i). That argument disregards the text and structure of the statute; threatens the vitality of the RIN bank, the "critical importance" of which this Court has acknowledged; and ignores the history of the RFS Program, which reflects Congress's concern with cellulosic biofuel production shortfalls. The RFS statute is clear: The "projected volume available" does not include carryover cellulosic RINs.

**I.A.** The phrase "projected volume available," as used in the cellulosic waiver provision, means what it says. It requires EPA to reduce the volume requirements for cellulosic biofuel to the "volume[s]" that EPA "projects" will be "available" in the forthcoming "calendar year." The meaning of the phrase is even clearer in context because "projected volume available" is shorthand for a longer phrase that appears earlier in the same paragraph: the "projected volume *of cellulosic biofuel production*." By definition, carryover RIN credits do not reflect actual "biofuel

1

production" in the forthcoming calendar year.  Notably, the waiver provision does not mention "credits," even though the statute uses that term repeatedly, and in a way that distinguishes "credits" from "volumes" of actual fuel.  In short, the text and structure of the statute foreclose the Biofuels Petitioners' argument that carryover cellulosic RINs fall within the "projected volume available."

**B.**     Limiting the "projected volume available" to fuel expected to be produced in the relevant year advances the purposes of the RFS statute by preserving the viability of the carryover RIN bank, which is of "critical importance … to the functioning of the renewable fuel market and to the ability of obligated parties to comply with their obligations."  *Ams. for Clean Energy v. EPA*, 864 F.3d 691, 714 (D.C. Cir. 2017).  Like personal savings or business inventory, the RIN bank provides a stabilizing "buffer"—both for individual obligated parties and the market as a whole—when production levels fall below EPA's projections.  The Biofuels Petitioners' reading would force EPA to set cellulosic biofuel projections at levels that would threaten to eliminate the bank of carryover cellulosic RINs, and with it, the stability of the RFS Program.

**C.**     The Biofuels Petitioners' approach also ignores the history of the RFS Program, which reflects Congress's overriding concern for cellulosic biofuel production shortfalls and the particular need for compliance flexibility with respect to that fuel type.  When Congress enacted the RFS statute, it was unclear whether

cellulosic biofuel would be produced at all, so Congress initially delayed the onset of cellulosic biofuel volume requirements for eight years until 2013. *See* 42 U.S.C. § 7545(*o*)(2)(B)(iii) (2006). Those concerns continued through the 2007 amendments, which also delayed cellulosic biofuel requirements and added the cellulosic waiver provisions as a "safety-valve" to avoid putting producers "in an impossible position" where the volume requirement far exceeded what was actually produced. *API v. EPA*, 706 F.3d 474, 479 (D.C. Cir. 2013). The RFS Program incorporates multiple compliance safety valves for cellulosic biofuels—including cellulosic waiver credits—precisely because Congress was especially concerned about production shortfalls in that category.

**II.** EPA was not required to consider carryover cellulosic RINs under its reset authority. In the 2020-2022 Rule, EPA determined that its reset authority turned on the same "projected volume available" analysis that supports its cellulosic waiver authority. Relying on that connection, the Biofuels Petitioners argue that EPA's failure to consider carryover RINs under its cellulosic waiver authority means that EPA also failed to consider those RINs under its reset authority. The Court should reject this argument because it relies on the mistaken premise that EPA must count carryover RINs when determining the "projected volume available" of cellulosic biofuel.

3

## ARGUMENT

## I.    The Biofuels Petitioners' Challenge to EPA's Application of the Cellulosic Waiver Authority Fails.

Under its cellulosic waiver authority, EPA must determine whether the "projected volume of cellulosic biofuel production" for a given year is less than the statutory cellulosic biofuel volume target for that year.    42 U.S.C. § 7545(*o*)(7)(D)(i).  If that is the case, EPA must reduce the cellulosic biofuel requirement to the "projected volume available" during the given year.  *Id.*; *see also API*, 706 F.3d at 476 (requiring EPA to take "neutral aim at accuracy" when making such projections).  The Biofuels Petitioners argue (at 18-34) that EPA must include carryover cellulosic RINs when calculating the "projected volume available" for the upcoming year.  EPA takes the position (at 21) that the cellulosic waiver provision, while silent as to the meaning of "projected volume available," is best interpreted to encompass only the actual volumes of biofuel projected to be produced in a given year.

Intervenors agree with EPA's bottom-line conclusion and that EPA's interpretation is reasonable.  But there is an additional reason to reject the Biofuels Petitioners' interpretation:  The statute speaks directly to this issue.  *See Garvey v. Admin. Rev. Bd.*, 56 F.4th 110, 121 (D.C. Cir. 2022) ("*Chevron* deference does not apply where the statute is clear." (cleaned up)); *see also Rotkiske v. Klemm*, 140 S.

4

Ct. 355, 360 (2019) (similar).    The statute's text, structure, and purpose unambiguously establish that carryover cellulosic RINs are not part of the "projected volume available."

### A.    The Statute's Text and Structure Make Clear that the "Projected Volume Available" Does Not Include Carryover Cellulosic RINs.

1.    The statutory text directs EPA to reduce the annual cellulosic biofuel requirement to the "projected volume available."    42 U.S.C. § 7545(*o*)(7)(D)(i). That phrase must be read in context.    *See West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022).    The cellulosic waiver provision states:

> For any calendar year for which *the projected volume of cellulosic biofuel production* is less than the minimum applicable volume established under [the statute] … the Administrator shall reduce the applicable volume of cellulosic biofuel required under paragraph (2)(B) to *the projected volume available* during that calendar year.

42 U.S.C. § 7545(*o*)(7)(D)(i) (emphases added).

The repeated use of "projected volume" is key.    The first use refers to the "projected volume of cellulosic biofuel production" "[f]or any calendar year," and the second refers back to that "projected volume."    *See id.*    Thus, under straightforward canons of statutory construction, both references to "projected volume" can be expected to "mea[n] the same thing."    *PDK Lab'ys Inc. v. DEA*, 362 F.3d 786, 796 (D.C. Cir. 2004).    And the provision's abbreviated, second use of "projected volume" reflects a common drafting technique in which the long-form

version of a phrase is followed by the short-form. *See Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) ("Referential … phrases, where no contrary intention appears, refer solely to the last antecedent."). Taken together, these principles yield one conclusion: the "projected volume available during that calendar year" means the "projected volume [*of cellulosic biofuel production*] available during that calendar year."

That reading forecloses the argument that carryover cellulosic RINs may be counted as part of a given year's "projected volume." By definition, carryover RINs represent biofuel produced during the *prior* calendar year. They are not the actual "cellulosic biofuel produc[ed]," 42 U.S.C. § 7545(*o*)(7)(D)(i), nor are these carryover credits produced (or even generated) "during [the given] calendar year," *id.* In short, the cellulosic waiver provision deals only with the actual "cellulosic biofuel tha[t] the market is projected to provide in any given year." *AFPM v. EPA*, 937 F.3d 559, 570 (D.C. Cir. 2019). Carryover RINs do not factor into that calculus.

The statutory references to the "volume" of fuel, contrasted with the absence of any mention of "credits," provide further evidence that carryover RINs are not included in the "projected volume available." This Court applied that logic in *Americans for Clean Energy*, where petitioners similarly argued that carryover RINs should be counted as part of the "supply of renewable fuel" for purposes of the inadequate domestic supply waiver. *See* 864 F.3d at 713. The Court rejected that

argument in part because that waiver provision "does not reference carryover RINs as a source of supply of renewable fuel." *Id.* at 714. Accepting the contrary position would have required reading words into the statute, such that "supply of renewable fuel" would become "supply of renewable fuel *and supply of carryover credits*." *Id.* at 714. The Biofuels Petitioners' position is deficient in the same way: It would require reading "projected volume available" to mean "projected volume *and carryover credits* available." In contrast, EPA's interpretation reads "projected volume available" "to mean just that." *See id.* at 714.

Rather than addressing these conclusions, the Biofuels Petitioners rely on "available" to read carryover RINs into the statute. But the reference to the "projected volume *available*" only strengthens the conclusions above. The term "available" is a modifier that *narrows* the relevant category of "projected volume." It allows EPA to account for situations where cellulosic biofuel projected to be produced in an upcoming year will not be available to use for compliance, such as where the fuel is sold for use other than as a transportation fuel. *See, e.g.*, 80 Fed. Reg. 77,420, 77,506 n.217 (Dec. 14, 2015). But this modifier does not, as the Biofuels' Petitioners argue, expand the meaning of "projected volume" beyond its statutory scope to include carryover RINs. Moreover, even if carryover cellulosic RINs could be considered "projected volume"—they cannot be—they would not be

7

"available" as a practical matter because of the need to preserve a viable RIN bank. *See infra* section I.B.

2.    The RFS statute's broader structure also forecloses the Biofuels Petitioners' flawed reading.  The cellulosic waiver provision includes a notable cross-reference:  It requires the "projected volume of cellulosic biofuel production" to be "based on the estimate provided under paragraph (3)(A)."  42 U.S.C. § 7545(*o*)(7)(D)(i).  Paragraph (3)(A), in turn, directs the Administrator of the Energy Information Administration to "provide to [EPA] an estimate, with respect to the following calendar year, of the *volumes of ... cellulosic biofuel projected to be sold or introduced* into commerce in the United States."  *Id.* § 7545(*o*)(3)(A) (emphasis added).  In other words, Congress wanted EPA's "projected volume" determination to be based on estimates of the actual volumes of biofuel expected to be sold or introduced in a forthcoming year—not the carryover credits that represent biofuel from a past year.  As this Court already explained, the cellulosic waiver provision's "reference to the 'projected volume of cellulosic biofuel' seems plainly to call for a prediction of what *will actually* happen."  *API*, 706 F.3d at 479 (emphasis added).

The RFS statute also distinguishes between "credits" and "volumes." Immediately following the cellulosic waiver provision, for example, is the requirement that EPA "make available for sale cellulosic biofuel *credits*" after EPA

8

has "reduce[d] the minimum cellulosic biofuel *volume*" under the waiver provision. 42 U.S.C. § 7545(*o*)(7)(D)(ii) (emphases added). The subsequent provision then directs EPA to "limit the number of cellulosic biofuel *credits* for any calendar year to the minimum applicable *volume* (as reduced under this subparagraph) of cellulosic biofuel for that year." *Id.* § 7545(*o*)(7)(D)(iii) (emphases added). Unlike the cellulosic waiver provision, these subsequent provisions *do* mention credits in the cellulosic biofuel context.

The rest of the RFS statute similarly treats "credits" and "volumes" as distinct concepts. Just as the cellulosic waiver provision uses "volume" to refer to "cellulosic biofuel production," *id.* § 7545(*o*)(7)(D)(i), the statute uses the word "volume" to refer to physical fuel.[1] By contrast, the statute refers to the "amount" or "number" of credits, rather than "volume."[2] In the one instance where "credits"

---

[1] *See, e.g.*, 42 U.S.C. § 7545(*o*)(2)(A)(i) (requiring "gasoline" or "transportation fuel" to contain a certain "volume of renewable fuel"), (2)(A)(iv) (referring to "renewable fuel in gasoline … on a volume basis"), (2)(B)(i) (setting forth the "applicable volumes" for different fuel types in "billions of gallons"), (2)(B)(ii) (directing EPA to consider factors centered on the actual "production of renewable fuels" when determining "applicable volumes" after 2022), (3)(A) (discussing "the volumes of transportation fuel, biomass-based diesel, and cellulosic biofuel projected to be sold or introduced"), (3)(B)(ii) (referring to "renewable fuel obligations" being "expressed in terms of a volume percentage of transportation fuel").

[2] *See, e.g.*, *id.* § 7545(*o*)(5)(A)(i) (referring to "the generation of an appropriate amount of credits"), (5)(A)(ii) (same), (5)(E) (same), (7)(D)(iii) (referring to "the number of cellulosic biofuel credits").

9

and "volume" appear in the same context, they address EPA generating credits *after* having already determined the projected volumes (and reduced the applicable volume obligations accordingly).  *See id.* § 7545(*o*)(7)(D)(ii)-(iii).

These "textual distinction[s] … mak[e] a difference."  *United States v. Novo A/S*, 5 F.4th 47, 57 (D.C. Cir. 2021).  They demonstrate that Congress's decision to *not* mention credits (carryover or not) in the cellulosic waiver provision was intentional.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (cleaned up)).

### B.    The Biofuels Petitioners' Approach Would Undermine the Liquidity of the RIN Bank and the Stability of the RFS Program.

Interpreting "projected volume available" to exclude carryover cellulosic RINs "makes eminent sense … when considered in light of the purposes of the Renewable Fuel Program statute."  *Ams. for Clean Energy*, 864 F.3d at 714.  Carryover RINs are of "critical importance … to the functioning of the renewable fuel market and to the ability of obligated parties to comply with their obligations."  *Id.*  The carryover RIN bank, including carryover cellulosic RINs, is similar to personal savings or business inventory.  It provides a stabilizing "buffer"—both for individual obligated parties and for the broader market—when production levels fall

10

short of EPA's projections.  The Biofuels Petitioners' reading, however, would force EPA to set cellulosic biofuel projections at levels that would systematically draw down or eliminate the bank of carryover cellulosic RINs.  That is reason enough to reject their interpretation.  *See Motor Vehicle Mfrs. Ass'n of U.S. v. Ruckelshaus*, 719 F.2d 1159, 1165 (D.C. Cir. 1983) ("A statute should ordinarily be read to effectuate its purposes rather than to frustrate them.").

The central role of the carryover RIN bank is rooted in the statute.  When designing the Renewable Fuel Program, Congress empowered EPA to promulgate regulations establishing a system of "[c]redits" that would facilitate "complying" with the statute's standards.  42 U.S.C. § 7545(*o*)(5)(A), (B).  EPA has long interpreted the statute as allowing credits to be "valid to show compliance" for a period that extended across two calendar years.  *Id.* § 7545(*o*)(5)(C); *see also* 40 C.F.R. § 80.1428(c) ("[A] RIN is valid for compliance during the calendar year in which it was generated, or the following calendar year.").  This "compliance system is flexible in that RINs may be retired in compliance demonstrations not only in the compliance year during which they were generated, but also throughout the ensuing compliance year, and obligated parties may carry over excess RINs or RIN deficits from year to year."  *Alon Refin. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 657 (D.C. Cir. 2019) (citation omitted).  Indeed, by establishing a credit trading system that included carryover credits, "Congress required EPA to facilitate statutory

compliance," *id.*, by "ensur[ing] that obligated parties have sufficient flexibility to comply with the statute," *Ams. for Clean Energy*, 864 F.3d at 715.

This Court has recognized that a sufficient bank of carryover RINs is critical to the functioning and stability of the RFS Program. For example, in *Americans for Clean Energy*, the Court rejected the argument that EPA was required to include carryover RINs when determining if the "domestic supply" for a given year would be "inadequate" because that statutory reading would have reduced "the number of carryover RINs in the market … to almost zero." *Id.* at 715. The Court agreed with EPA's explanation that "[w]ithout the flexibility and liquidity provided by carryover RINs," obligated parties could be "left with no way to comply with the statute" when faced with "unexpected shortfalls or increased demand for transportation fuel." *Id.* And "[t]hat situation, in turn, could lead to the need for a new waiver of the standards and thereby undermine the market certainty so critical to the long term success of the Renewable Fuel Program." *Id.* (cleaned up). The "critical importance of carryover RINs" thus counseled in favor of an interpretation of the statute that would preserve the health of the carryover RIN bank. *See id.* at 714-15.

*Americans for Clean Energy* was not the only time the Court has acknowledged the significance of carryover RINs. The Court has cited the availability of carryover RINs in various contexts as a programmatic feature that enhances stability and compliance flexibility for obligated parties. *See, e.g.*, *Monroe*

12

*Energy, LLC v. EPA*, 750 F.3d 909, 916-17 (D.C. Cir. 2014) (endorsing EPA's explanation that "carryover RINs are a valid compliance mechanism and a means for obligated parties to protect against any potential supply shortfalls that could limit the availability of RINs" (cleaned up)); *AFPM*, 937 F.3d at 582 (upholding as reasonable EPA's decision not to exercise general waiver authority, where explanation relied in part on availability of carryover RINs, including "carryover cellulosic biofuel RINs," to meet obligations); *Alon Refin.*, 936 F.3d at 657 (carryover RINs help "facilitate statutory compliance").

From the beginning of the Renewable Fuel Program, EPA has likewise stressed the importance of the carryover RIN bank. In 2007, when the agency first promulgated regulations under the Program (including the regulation that clarified the status of carryover RINs, 40 C.F.R. § 80.1428(c)), EPA explained that carryover RINs were a "critical aspect of the trading system" because they "provide[] a window within which banking and trading can be used to offset the negative effects of fluctuations in either supply of or demand for renewable fuels." 72 Fed. Reg. 23,900, 23,933 (May 1, 2007). Over the last 15 years—including in the rule under review—EPA has consistently reaffirmed that a viable carryover RIN bank is "extremely important" to the "success of the entire program" given "substantial uncertainties in the transportation fuel marketplace." 2020-2022 Rule at 39,613. For example, "unforeseen circumstances" such as "a cyberattack on biorefineries" would

13

create a major need for banked credits. *See* 2020-2022 RFS Response to Comments 34 (2022). Without banked credits, such situations could lead to deficits, noncompliance by obligated parties, or a "retroactive waiver of the standards, undermining the market certainty so critical to the RFS program." 2020-2022 Rule at 39,614; *see also* 2020-2022 RFS Response to Comments, at 34 (describing RIN bank as "analogous to a typical bank account or inventory").

In sum, the carryover RIN bank is a critical aspect of the credit trading system that Congress created to offer compliance flexibility to obligated parties and promote the Program's long-term stability.

Accepting the Biofuels Petitioners' argument that carryover cellulosic RINs are included in the "projected volume available" under the cellulosic waiver provision would threaten the continued existence of the cellulosic RIN bank. Factoring these carryover credits into the projected volumes of available cellulosic biofuel would increase the applicable volume requirements, and obligated parties would need to retire enough RINs to meet those heightened obligations. As in *Americans for Clean Energy*, this Court should reject a proposed reading of the statute that would threaten the liquidity of the RIN bank and with it, the viability of the Renewable Fuel Program.

### C.    The RFS Program Includes Multiple Safety Valves for Cellulosic Biofuel Because Congress Was Particularly Concerned About Production Shortfalls for that Fuel Category.

The Biofuels Petitioners assert that there is no need for carryover cellulosic RINs because the statute separately provides for cellulosic waiver credits.[3]  *See* Biofuels Br. 27-29.  That analysis gets things backwards:  The Renewable Fuel Program incorporates *multiple* compliance safety valves for cellulosic biofuels— including cellulosic waiver credits—because Congress was especially concerned about production shortfalls of cellulosic biofuel.  As this Court has noted, it was "with respect to cellulosic biofuel" in particular that "Congress evince[d] a clear concern for production shortfalls."  *API*, 706 F.3d at 479.

When Congress established the Renewable Fuel Program in 2005, cellulosic biofuel had never been produced in commercial quantities and *any* production of cellulosic biofuel was highly uncertain.  Congress accordingly delayed the onset of cellulosic biofuel volume requirements until 2013, the eighth compliance year following enactment.  *See* 42 U.S.C. § 7545(*o*)(2)(B)(iii) (2006).  In the years between 2005 and 2013, the statute provided market incentives (but not mandates)

---

[3] EPA must issue cellulosic waiver credits whenever it reduces the statutory cellulosic volume requirements for a given year to an amount above zero. 42 U.S.C. § 7545(*o*)(7)(D)(ii).  These credits function differently than general RIN credits insofar as they can only be used in the compliance year that they are made available, are nonrefundable and nontransferable, and can only be used to satisfy an obligated party's cellulosic biofuel volume obligations. 40 C.F.R. § 80.1456(b).

for the use of cellulosic biofuel.  *Id.* § 7545(*o*)(4) (2006) (providing that "1 gallon of cellulosic biomass ethanol or waste derived ethanol shall be considered to be the equivalent of 2.5 gallons of renewable fuel").  Congress's caution was well-founded: "As of October 2006, the only known cellulose-to-ethanol plant in North America was Iogen in Canada, which produce[d] approximately one million gallons of ethanol per year from wood chips."  72 Fed. Reg. 23,900, 23,952 (May 1, 2007).

Congress continued to exhibit special concern over cellulosic biofuel production when it amended the Renewable Fuel Program statute in 2007.  *See* Pub. Law 110-140, §§ 201-251, 121 Stat. 1492, 1519-49.  Congress established statutory requirements for four different types of renewable fuel through 2022, including cellulosic biofuel.  42 U.S.C. § 7545(*o*)(2)(B).  But Congress delayed the volume requirements for cellulosic biofuel longer than for any other type of fuel.  *See id.* § 7545(*o*)(2)(B)(i)(III).  Congress also enacted the *nondiscretionary* cellulosic biofuel waiver at issue here as part of the 2007 amendments.  Under that waiver, EPA is required to reduce applicable cellulosic biofuel volumes to the projected volume of that fuel that will be actually be produced in the relevant calendar year, *see id.* § 7545(*o*)(7)(D)(i)—a requirement that Congress did not mandate for any other fuel type.  Congress also adopted the cellulosic waiver requirement *in addition to* the general waiver provisions applicable to all renewable fuels, reflecting an intent to provide EPA an additional path to alleviate cellulosic biofuel requirements.

16

Finally, Congress established a specific formula to calculate the price of cellulosic biofuel credits available for purchase by obligated parties. *See id.* § 7545(*o*)(7)(D)(ii).

Contrary to the Biofuels Petitioners' assertion (at 28), the credit program is not evidence that credits are the *only* compliance flexibility mechanism for obligated parties. Instead, the credits are part of a layered statutory defense to guard against the inherent unreliability of projecting the production of an entirely new type of renewable fuel many years into the future. An obligated party may "only purchase waiver credits from the EPA to the degree that it establishes it owns insufficient cellulosic biofuel RINs." 75 Fed. Reg. 14,670, 14,727 (Mar. 28, 2010). In that instance, where there are insufficient cellulosic RINs even after EPA's exercise of its waiver authority, the credit program serves the important function of "ensur[ing] that there is a predictable upper limit to the price that cellulosic biofuel producers can charge for a gallon of cellulosic biofuel and its assigned RIN." *Id.* If Congress intended to provide *less* compliance flexibility for cellulosic biofuel than for other renewable fuels, it would have made little sense to mandate the sale of *alternative* credits to occur "*whenever* the Administrator reduces the minimum cellulosic biofuel volume." 42 U.S.C. § 7545(*o*)(7)(D)(ii) (emphasis added).

17

## II.    For the Same Reasons, the Biofuels Petitioners' Challenge to the EPA's Reset Authority Also Fails.

In addition to challenging EPA's exercise of its cellulosic waiver authority, the Biofuels Petitioners challenge EPA's exercise of its reset authority.  Under its reset authority, EPA must "modif[y] the applicable volumes set forth in the [statute] for all years following the final year to which the waiver applies" if, under a different waiver authority, it lowers the applicable volume requirements beyond a certain threshold.  42 U.S.C. § 7545(*o*)(7)(F).  The statute identifies six factors for EPA to consider, *see id.* § 7545(*o*)(2)(B)(ii), and EPA determined in the 2020-2022 Rule that those factors resulted in "the resulting volume after exercise of the cellulosic waiver authority," i.e., the "projected volume available" inquiry discussed above, 2020-2022 Rule at 39,608.  The Biofuels Petitioners (at 47) rely on this connection and contend that application of EPA's reset authority was also flawed because EPA failed to consider carryover RINs in its calculation of the "projected volume available."   But for the reasons just discussed, EPA correctly determined the "projected volume available" by excluding carryover cellulosic RINs.  *See supra* section I.  Because the core premise of the Biofuels Petitioners' challenge to EPA's reset authority fails, the Court should deny their petition for review on this issue as well.

18

## CONCLUSION

The Biofuels Petitioners' challenges to the 2020-2022 Rule should be rejected and their petitions for review denied.

Respectfully submitted,

*/s/ Robert J. Meyers*
Robert J. Meyers
Elizabeth B. Dawson
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
(202) 624-2789

Richard S. Moskowitz
Tyler Kubik
American Fuel & Petrochemical
Manufacturers
1800 M Street, NW, Suite 900N
Washington, DC 20036

*Counsel for American Fuel &
Petrochemical Manufacturers*

*/s/ Robert A. Long, Jr.*
Robert A. Long, Jr.
Kevin F. King
Thomas R. Brugato
Daniel G. Randolph
MaKade C. Claypool
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-5488

Ryan Meyers
John Wagner
Michele Schoeppe
American Petroleum Institute
200 Massachusetts Ave. NW
Suite 1100
Washington, DC 20001

*Counsel for American Petroleum
Institute*

## CERTIFICATE OF COMPLIANCE

This brief complies with this Court's February 1, 2023 order (Doc. 1984205) because it contains 4,179 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).  This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word and 14-point Times New Roman font.

*/s/ Robert A. Long, Jr.*
Robert A. Long, Jr.

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2023, I caused copies of the foregoing brief to be served by the Court's CM/ECF system, which will send a notice of the filing to all registered CM/ECF users.

*/s/ Robert A. Long, Jr.*
Robert A. Long, Jr.

# **ADDENDUM**

## <u>TABLE OF CONTENTS</u>

**Addendum Page**

**Statute**

42 U.S.C. § 7545(*o*) (2006) .........................................................................1

**(o) Renewable fuel program**

**(1) Definitions**

In this section:

**(A) Cellulosic biomass ethanol**

The term ''cellulosic biomass ethanol'' means ethanol derived from any lignocellulosic or hemicellulosic matter that is available on a renewable or recurring basis, including—

    (i) dedicated energy crops and trees;

    (ii) wood and wood residues;

    (iii) plants;

    (iv) grasses;

    (v) agricultural residues;

    (vi) fibers;

    (vii) animal wastes and other waste materials; and

    (viii) municipal solid waste.

The term also includes any ethanol produced in facilities where animal wastes or other waste materials are digested or otherwise used to displace 90 percent or more of the fossil fuel normally used in the production of ethanol.

**(B) Waste derived ethanol**

The term ''waste derived ethanol'' means ethanol derived from—

    (i) animal wastes, including poultry fats and poultry wastes, and other waste materials; or

    (ii) municipal solid waste.

**(C) Renewable fuel**

**(i) In general**

The term ''renewable fuel'' means motor vehicle fuel that—

    (I)(aa) is produced from grain, starch, oilseeds, vegetable, animal, or fish materials including fats, greases, and oils, sugarcane, sugar beets, sugar components, tobacco, potatoes, or other biomass; or

    (bb) is natural gas produced from a biogas source, including a landfill, sewage waste treatment plant, feedlot, or other place where decaying organic material is found; and

    (II) is used to replace or reduce the quantity of fossil fuel present in a fuel mixture used to operate a motor vehicle.

**(ii) Inclusion**

The term ''renewable fuel'' includes—

    (I) cellulosic biomass ethanol and ''waste derived ethanol''; and

    (II) biodiesel (as defined in section 13220(f) of this title) and any blending components derived from renewable fuel (provided that only the renewable fuel portion of any such blending component shall be considered part of the applicable volume under the renewable fuel program established by this subsection).

**(D) Small refinery**

The term ''small refinery'' means a refinery for which the average aggregate daily crude oil throughput for a calendar year (as determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels.

**(2) Renewable fuel program**

**(A) Regulations**

**(i) In general**

Not later than 1 year after August 8, 2005, the Administrator shall promulgate regulations to ensure that gasoline sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains the applicable volume of renewable fuel determined in accordance with subparagraph (B).

**(ii) Noncontiguous State opt-in**

**(I) In general**

On the petition of a noncontiguous State or territory, the Administrator may allow the renewable fuel program established under this subsection to apply in the noncontiguous State or territory at the same time or any time after the Administrator promulgates regulations under this subparagraph.

**(II) Other actions**

In carrying out this clause, the Administrator may—

    (aa) issue or revise regulations under this paragraph;

    (bb) establish applicable percentages under paragraph (3);

    (cc) provide for the generation of credits under paragraph (5); and

    (dd) take such other actions as are necessary to allow for the application of the renewable fuels program in a noncontiguous State or territory.

**(iii) Provisions of regulations**

Regardless of the date of promulgation, the regulations promulgated under clause (i)—

    (I) shall contain compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate, to ensure that the requirements of this paragraph are met; but

    (II) shall not—

        (aa) restrict geographic areas in which renewable fuel may be used; or

        (bb) impose any per-gallon obligation for the use of renewable fuel.

**(iv) Requirement in case of failure to promulgate regulations**

If the Administrator does not promulgate regulations under clause (i), the percentage of renewable fuel in gasoline sold or dispensed to consumers in the United States, on a volume basis, shall be 2.78 percent for calendar year 2006.

**(B) Applicable volume**

**(i) Calendar years 2006 through 2012**

For the purpose of subparagraph (A), the applicable volume for any of calendar years 2006 through 2012 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of renewable fuel (in billions of gallons): |
|---|---|
| 2006 ......................................... | 4.0 |
| 2007 ......................................... | 4.7 |
| 2008 ......................................... | 5.4 |
| 2009 ......................................... | 6.1 |
| 2010 ......................................... | 6.8 |
| 2011 ......................................... | 7.4 |
| 2012 ......................................... | 7.5. |

**(ii) Calendar year 2013 and thereafter**

Subject to clauses (iii) and (iv), for the purposes of subparagraph (A), the applicable volume for calendar year 2013 and each calendar year thereafter shall be determined by the Administrator, in coordination with the Secretary of Agriculture and the Secretary of Energy, based on a review of the implementation of the program during calendar years 2006 through 2012, including a review of—

(I) the impact of the use of renewable fuels on the environment, air quality, energy security, job creation, and rural economic development; and

(II) the expected annual rate of future production of renewable fuels, including cellulosic ethanol.

**(iii) Minimum quantity derived from cellulosic biomass**

For calendar year 2013 and each calendar year thereafter—

(I) the applicable volume referred to in clause (ii) shall contain a minimum of 250,000,000 gallons that are derived from cellulosic biomass; and

(II) the 2.5-to-1 ratio referred to in paragraph (4) shall not apply.

**(iv) Minimum applicable volume**

For the purpose of subparagraph (A), the applicable volume for calendar year 2013 and each calendar year thereafter shall be equal to the product obtained by multiplying—

(I) the number of gallons of gasoline that the Administrator estimates will be sold or introduced into commerce in the calendar year; and

(II) the ratio that—

(aa) 7,500,000,000 gallons of renewable fuel; bears to

(bb) the number of gallons of gasoline sold or introduced into commerce in calendar year 2012.

**(3) Applicable percentages**

**(A) Provision of estimate of volumes of gasoline sales**

Not later than October 31 of each of calendar years 2005 through 2011, the Administrator of the Energy Information Administration shall provide to the Administrator of the Environmental Protection Agency an estimate, with respect to the following calendar year, of the volumes of gasoline projected to be sold or introduced into commerce in the United States.

**(B) Determination of applicable percentages**

**(i) In general**

Not later than November 30 of each of calendar years 2005 through 2012, based on the estimate provided under subparagraph (A), the Administrator of the Environmental Protection Agency shall determine and publish in the Federal Register, with respect to the following calendar year, the renewable fuel obligation that ensures that the requirements of paragraph (2) are met.

**(ii) Required elements**

The renewable fuel obligation determined for a calendar year under clause (i) shall—

(I) be applicable to refineries, blenders, and importers, as appropriate;

(II) be expressed in terms of a volume percentage of gasoline sold or introduced into commerce in the United States; and

(III) subject to subparagraph (C)(i), consist of a single applicable percentage that applies to all categories of persons specified in subclause (I).

**(C) Adjustments**

In determining the applicable percentage for a calendar year, the Administrator shall make adjustments—

(i) to prevent the imposition of redundant obligations on any person specified in subparagraph (B)(ii)(I); and

(ii) to account for the use of renewable fuel during the previous calendar year by small refineries that are exempt under paragraph (9).

**(4) Cellulosic biomass ethanol or waste derived ethanol**

For the purpose of paragraph (2), 1 gallon of cellulosic biomass ethanol or waste derived ethanol shall be considered to be the equivalent of 2.5 gallons of renewable fuel.

**(5) Credit program**

**(A) In general**

The regulations promulgated under paragraph (2)(A) shall provide—

(i) for the generation of an appropriate amount of credits by any person that refines, blends, or imports gasoline that contains a quantity of renewable fuel that is greater than the quantity required under paragraph (2);

(ii) for the generation of an appropriate amount of credits for biodiesel; and

(iii) for the generation of credits by small refineries in accordance with paragraph (9)(C).

**(B) Use of credits**

A person that generates credits under subparagraph (A) may use the credits, or transfer all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

**(C) Duration of credits**

A credit generated under this paragraph shall be valid to show compliance for the 12 months as of the date of generation.

**(D) Inability to generate or purchase sufficient credits**

The regulations promulgated under paragraph (2)(A) shall include provisions allowing any person that is unable to generate or purchase sufficient credits to meet the requirements of paragraph (2) to carry forward a renewable fuel deficit on condition that the person, in the calendar year following the year in which the renewable fuel deficit is created—

    (i) achieves compliance with the renewable fuel requirement under paragraph (2); and

    (ii) generates or purchases additional renewable fuel credits to offset the renewable fuel deficit of the previous year.

**(6) Seasonal variations in renewable fuel use**

**(A) Study**

For each of calendar years 2006 through 2012, the Administrator of the Energy Information Administration shall conduct a study of renewable fuel blending to determine whether there are excessive seasonal variations in the use of renewable fuel.

**(B) Regulation of excessive seasonal variations**

If, for any calendar year, the Administrator of the Energy Information Administration, based on the study under subparagraph (A), makes the determinations specified in subparagraph (C), the Administrator of the Environmental Protection Agency shall promulgate regulations to ensure that 25 percent or more of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) is used during each of the 2 periods specified in subparagraph (D) of each subsequent calendar year.

**(C) Determinations**

The determinations referred to in subparagraph (B) are that—

    (i) less than 25 percent of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) has been used during 1 of the 2 periods specified in subparagraph (D) of the calendar year;

    (ii) a pattern of excessive seasonal variation described in clause (i) will continue in subsequent calendar years; and

    (iii) promulgating regulations or other requirements to impose a 25 percent or more seasonal use of renewable fuels will not prevent or interfere with the attainment of national ambient air quality standards or significantly increase the price of motor fuels to the consumer.

**(D) Periods**

The 2 periods referred to in this paragraph are—

    (i) April through September; and

    (ii) January through March and October through December.

**(E) Exclusion**

Renewable fuel blended or consumed in calendar year 2006 in a State that has received a waiver under section 7543(b) of this title shall not be included in the study under subparagraph (A).

**(F) State exemption from seasonality requirements**

Notwithstanding any other provision of law, the seasonality requirement relating to renewable fuel use established by this paragraph shall not apply to any State that has received a waiver under section 7543(b) of this title or any State dependent on refineries in such State for gasoline supplies.

**(7) Waivers**

**(A) In general**

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, may waive the requirements of paragraph (2) in whole or in part on petition by one or more States by reducing the national quantity of renewable fuel required under paragraph (2)—

    (i) based on a determination by the Administrator, after public notice and opportunity for comment, that implementation of the requirement would severely harm the economy or environment of a State, a region, or the United States; or

    (ii) based on a determination by the Administrator, after public notice and opportunity for comment, that there is an inadequate domestic supply.

**(B) Petitions for waivers**

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, shall approve or disapprove a State petition for a waiver of the requirements of paragraph (2) within 90 days after the date on which the petition is received by the Administrator.

**(C) Termination of waivers**

A waiver granted under subparagraph (A) shall terminate after 1 year, but may be renewed by the Administrator after consultation with the Secretary of Agriculture and the Secretary of Energy.

**(8) Study and waiver for initial year of program**

**(A) In general**

Not later than 180 days after August 8, 2005, the Secretary of Energy shall conduct for the Administrator a study assessing whether the renewable fuel requirement under paragraph (2) will likely result in significant adverse impacts on consumers in 2006, on a national, regional, or State basis.

**(B) Required evaluations**

The study shall evaluate renewable fuel—

    (i) supplies and prices;

    (ii) blendstock supplies; and

    (iii) supply and distribution system capabilities.

**(C) Recommendations by the Secretary**

Based on the results of the study, the Secretary of Energy shall make specific recommendations to the Administrator concerning waiver of the requirements of paragraph (2), in whole or in part, to prevent any adverse impacts described in subparagraph (A).

**(D) Waiver**

**(i) In general**

Not later than 270 days after August 8, 2005, the Administrator shall, if and to the extent recommended by the Secretary of Energy under subparagraph (C), waive, in whole or in part, the renewable fuel requirement under paragraph (2) by reducing the national quantity of renewable fuel required under paragraph (2) in calendar year 2006.

**(ii) No effect on waiver authority**

Clause (i) does not limit the authority of the Administrator to waive the requirements of paragraph (2) in whole, or in part, under paragraph (7).

**(9) Small refineries**

**(A) Temporary exemption**

**(i) In general**

The requirements of paragraph (2) shall not apply to small refineries until calendar year 2011.

**(ii) Extension of exemption**

**(I) Study by Secretary of Energy**

Not later than December 31, 2008, the Secretary of Energy shall conduct for the Administrator a study to determine whether compliance with the requirements of paragraph (2) would impose a disproportionate economic hardship on small refineries.

**(II) Extension of exemption**

In the case of a small refinery that the Secretary of Energy determines under subclause (I) would be subject to a disproportionate economic hardship if required to comply with paragraph (2), the Administrator shall extend the exemption under clause (i) for the small refinery for a period of not less than 2 additional years.

**(B) Petitions based on disproportionate economic hardship**

**(i) Extension of exemption**

A small refinery may at any time petition the Administrator for an extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship.

**(ii) Evaluation of petitions**

In evaluating a petition under clause (i), the Administrator, in consultation with the Secretary of Energy, shall consider the findings of the study under subparagraph (A)(ii) and other economic factors.

**(iii) Deadline for action on petitions**

The Administrator shall act on any petition submitted by a small refinery for a hardship exemption not later than 90 days after the date of receipt of the petition.

**(C) Credit program**

If a small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A), the regula-

tions promulgated under paragraph (2)(A) shall provide for the generation of credits by the small refinery under paragraph (5) beginning in the calendar year following the date of notification.

**(D) Opt-in for small refineries**

A small refinery shall be subject to the requirements of paragraph (2) if the small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A).

**(10) Ethanol market concentration analysis**

**(A) Analysis**

**(i) In general**

Not later than 180 days after August 8, 2005, and annually thereafter, the Federal Trade Commission shall perform a market concentration analysis of the ethanol production industry using the Herfindahl-Hirschman Index to determine whether there is sufficient competition among industry participants to avoid price-setting and other anticompetitive behavior.

**(ii) Scoring**

For the purpose of scoring under clause (i) using the Herfindahl-Hirschman Index, all marketing arrangements among industry participants shall be considered.

**(B) Report**

Not later than December 1, 2005, and annually thereafter, the Federal Trade Commission shall submit to Congress and the Administrator a report on the results of the market concentration analysis performed under subparagraph (A)(i).

**(q)[8] Analyses of motor vehicle fuel changes and emissions model**

**(1) Anti-backsliding analysis**

**(A) Draft analysis**

Not later than 4 years after August 8, 2005, the Administrator shall publish for public comment a draft analysis of the changes in emissions of air pollutants and air quality due to the use of motor vehicle fuel and fuel additives resulting from implementation of the amendments made by the Energy Policy Act of 2005.

**(B) Final analysis**

After providing a reasonable opportunity for comment but not later than 5 years after August 8, 2005, the Administrator shall publish the analysis in final form.

**(2) Emissions model**

For the purposes of this section, not later than 4 years after August 8, 2005, the Administrator shall develop and finalize an emissions model that reflects, to the maximum extent practicable, the effects of gasoline characteristics or components on emissions from vehicles in the motor vehicle fleet during calendar year 2007.

**(3) Permeation effects study**

**(A) In general**

Not later than 1 year after August 8, 2005, the Administrator shall conduct a study,

---

[8] So in original. No subsec. (p) has been enacted.